UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEIL ZEITOUNI, Derivatively on Behalf of BLOCK, INC., <br><br> Plaintiff, <br><br> vs. <br><br> JACK DORSEY, ROELOF BOTHA, AMY BROOKS, SHAWN CARTER, PAUL DEIGHTON, RANDY GARUTTI, JAMES MCKELVEY, MARY MEEKER, LAWRENCE SUMMERS, and DARREN WALKER, <br><br> Defendants, <br><br> and <br><br> BLOCK, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> <u>**JURY DEMAND**</u> |

Plaintiff Neil Zeitouni, by his undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant Block, Inc. ("Block" or the "Company"), against Block's Board of Directors (the "Board") for their breaches of fiduciary duties and violations of the federal securities laws resulting in material damage to the Company and its stockholders. These allegations are made upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, transcripts of Block conference calls with financial analysts

and investors, news reports, financial analyst reports, and other publicly available information about the Company. Substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a stockholder derivative action brought against Block's Board members for their breaches of fiduciary duties, violations of the federal securities laws, and other illicit conduct, which resulted in substantial damage to the Company and its stockholders.

2.    Block is a global technology company offering Cash App, a financial platform which provides mobile payment services for consumers. Critical to these core operations is the gathering and storage of customer's personal identification information ("PII").

3.    Companies that gather and store PII must comply with strict responsibilities under federal and state laws, as well as under established industry standards. The Individual Defendants knew of these legal requirements, as well as the substantial risk to the Company's financial condition and core operations from breaches in data security and the need to adopt reasonable best cybersecurity practices, having acknowledged these very risks repeatedly in the Company's own public filings.

4.    However, the Individual Defendants failed to implement and monitor reasonable and appropriate internal controls over customers' PII.  Security breaches on the Cash App platform dating back to 2020, should have, but did not, serve as red flags to spur the Individual Defendants to investigate and take action.

5.    In December 2021, the Individual Defendants' misconduct resulted in the Company suffering a major data breach potentially compromising over eight million customers' PII. The Individual Defendants compounded the damage by failing to cause Block to comply with the

various federal and state laws requiring timely disclosure to consumers that their PII was unlawfully accessed. No disclosure of the data breach was made for *over four months*, giving virtual free reign to the hackers to use and sell Block's customers' stolen PII without pause.

6.     After Block finally disclosed the security breach, the Company's stock dropped 6.4% in one day. That prompted a securities class action lawsuit to be filed against the Company, Defendant Jack Dorsey ("Dorsey"), Block's co-founder, Block Head, and Chairperson, and the Company's Chief Financial Officer in this Court. A consumer class action was also filed against the Company and Cash App Investing, LLC in the United States District Court for the Northern District of California. Hence, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself and its officers.

7.     Further, the Individual Defendants caused additional damage to Block by causing it to repurchase more than a million shares of its own stock at artificially inflated prices.

8.     As a result of the Individual Defendants' breaches of fiduciary duty and other misconduct, Block has sustained substantial damages and irreparable injury to its reputation. The Individual Defendants' violations of the federal securities laws, including their securing the re-election of certain directors through a false and misleading proxy statement and causing the Company to repurchase shares on the open market at artificially inflated prices, have likewise caused material damage to the Company. Through this action, Plaintiff seeks to recover for the Company its damages and remediate the internal control failures that resulted in material injury to Block.

9.     Plaintiff did not make a demand prior to bringing this action because it would be futile. The Company's directors are neither disinterested nor independent. In the absence of this

action, Block will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.     JURISDICTION AND VENUE

10.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges claims arising under the laws of the United States. The claims asserted herein arise under Sections 10(b), as well as Rule 10b-5 promulgated thereunder, and 14(a), as well as Rule 14a-9 promulgated thereunder, of the Securities Exchange Act of 1934 (the "Exchange Act"). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     The Court has jurisdiction over each Defendant. Block does business in this District, which renders the Court's exercise of jurisdiction permissible under the traditional notions of fair play and substantial justice. The Individual Defendants, as corporate officers and/or directors of Block, have sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the wrongs took place in this District, the Individual Defendants transact business in this District, and the Individual Defendants' actions have had an effect in this District.

## III.     PARTIES

### A.     Plaintiff

14.     Plaintiff Neil Zeitouni is, and was at all relevant times, a shareholder of the Company. As such, Plaintiff was a shareholder at the time of the transactions complained of herein

and will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

**B.      Defendants**

**1.      Nominal Defendant Block, Inc.**

15.      Nominal defendant Block is incorporated in Delaware and its common stock trades on the New York Stock Exchange under the symbol "SQ."

**2.      Individual Defendants**

16.      Defendant Dorsey is the co-founder of Block serving as a principal executive officer and as director since July 2009. Dorsey served as Block's Chief Executive Officer ("CEO") and President from July 2009 until April 2022 when he became Block Head and Chairperson of the Board. As of March 31, 2022, Dorsey owns 48,844,566 Class B Block common shares,[1] with more than 43% of the Company's voting control.

17.      Defendant Roelof Botha ("Botha") is Lead Independent Director and a member of Block's Audit and Risk Committee and Compensation Committee. He is a partner at Sequoia Capital, a venture capital firm. As of March 31, 2022, Botha has voting control over 711,719 Class A Block shares, of which 15,727 are owned by Sequoia Capital and its affiliates.[2] Since 2021, Block paid Botha the following compensation:

| YEAR | STOCK AWARDS | TOTAL |
|------|--------------|-------|
| 2021 | $304,729 | $304,729 |

---

[1]      In Block's dual-class voting structure, Class B stock has ten times the voting rights of Class A stock.

[2]      Botha is deemed to share voting or investment control with respect to the shares held by Sequoia Capital and its affiliates.

18.     Defendant Amy Brooks ("Brooks") is a director since 2019 and a member of Blocks Nominating and Corporate Governance Committee. As of March 31, 2022, Brooks owns 6,236 Class A Block shares. Since 2021, Block paid Brooks the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|------|------|------|------|
| 2021 | N/A | $291,943 | $291,943 |

19.     Defendant Shawn Carter ("Carter") is a Block director since 2021. He is the founder of Roc Nation LLC ("Roc Nation"). Carter is a founder and shareholder of, and an artist at TIDAL, a global music and entertainment platform, which is currently majority owned by Block. As of March 31, 2022, Carter owned 31,607 Class A Block shares. Since 2021, Block paid Carter the following compensation:

| YEAR | STOCK AWARDS | TOTAL |
|------|------|------|
| 2021 | $286,527 | $286,527 |

20.     Defendant Paul Deighton ("Deighton") is a Director since 2016 and the Chair of Block's Audit and Risk Committee and a member of the Compensation Committee. As of March 31, 2022, Deighton owns 30,185 Class A Block shares. Since 2021, Block paid Deighton the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | OTHER COMPENSATION | TOTAL |
|------|------|------|------|------|
| 2021 | $49,904 | $249,842 | $3,263 | $303,009 |

21.     Defendant Randy Garutti ("Garutti") is a director since 2017 and Chair of Block's Nominating and Corporate Governance Committee.  He is CEO of Shake Shack Inc. ("Shake Shack").  As of March 31, 2022, Garutti owns 18,601 Class A Block shares.  Since 2021, Block paid Garutti the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2021 | $50,000 | $249,842 | $299,842 |

22.    Defendant James McKelvey ("McKelvey") is a co-founder of Block and director since 2009.  As of March 31, 2022, McKelvey owns 125,061 Class A Block shares and 12,259,025 Class B Block shares, giving him more than 10.8% of the Company's voting control.  Since 2021, Block paid McKelvey the following compensation:

| YEAR | STOCK AWARDS | TOTAL |
|---|---|---|
| 2021 | $289,619 | $289,619 |

23.    Defendant Mary Meeker ("Meeker") is a Director since 2011 and is the Chair of Block's Compensation Committee.  As of March 31, 2022, Meeker owns 406,250 Class A Block shares.  Since 2021, Block paid Meeker the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2021 | $15,000 | $304,729 | $319,729 |

24.    Defendant Lawrence Summers ("Summers") is a director since 2011 and a member of Block's Audit and Risk Committee. As of March 31, 2022, Summers owns 20,559 Class A Block shares and 67,380 Block Class B shares. Since 2021, Block paid Summers the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2021 | $50,000 | $249,842 | $299,842 |

25.    Defendant Darren Walker ("Walker") is a Block director since 2020.  He is a member of the Nominating and Corporate Governance Committee.  Walker is president of the Ford Foundation.  As of March 31, 2022, Walker owns 2,968 Class A Block shares.  Since 2021, Block paid Walker the following compensation:

| YEAR | STOCK AWARDS | TOTAL |
|------|--------------|-------|
| 2021 | $295,131 | $295,131 |

## IV.   THE INDIVIDUAL DEFENDANTS' DUTIES

26.     By reason of their positions as officers or directors of Block and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe to Block and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Block in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Block and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

27.     The Individual Defendants, because of their positions of control and authority as directors and officers of Block, were able to and did, directly and indirectly, exercise control over the wrongful acts complained of herein.

28.     As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on the New York Stock Exchange, the Individual Defendants also owed a duty to ensure the reporting of accurate, complete, and truthful information concerning Block's financial condition, operations, products, internal controls, and business prospects.  In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information.  In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over Block's management, policies, and internal controls.

29.     At all times relevant hereto, the Individual Defendants were the agents of each other and Block and were always acting within the course and scope of such agency.

30.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Block.

**A.     Duties Under Block's Code Of Business Conduct And Ethics**

31.     Block's Code of Business Conduct and Ethics (the "Code of Conduct") applies to "all employees, officers, and directors of Block."

32.     The Code of Conduct mandates the reporting of potential violations of the Code of Conduct, other Block policies, and legal or regulatory violations:

> Employees are responsible for fostering a safe, respectful, and productive environment. This means that you should report any concerns you have regarding a violation of Block's policies, including: (1) reporting suspected legal violations; (2) providing truthful information in connection with an inquiry or investigation by the Employee Relations team, the Informational Security team, the Incident Response team, an external investigator, a court, law enforcement, or any other governmental body; and (3) identifying potential violations of the Code or the Employee Handbook relevant to your locale.

33.     The Code of Conduct further obligates employees, officers, and directors to protect Block data, including PII:

> You have a shared duty to protect Block's intellectual property, MNPI, personally identifiable information, other data described in go/datapolicy (collectively, "Block Data") and other business assets. We take our intellectual property, Block Data, business systems, and network security very seriously. Good security, working practices, and procedures for Block property, in all its forms, are critical in protecting Block Data and intellectual property development that fuels Block's growth, the livelihood of employees, and our collective investment in Block. Block's files, networks, software, internet access, internet browser programs, email, voice mail, and other business equipment and resources are provided for business use, and they are the exclusive property of Block. Misuse of such property is not tolerated. We reserve the right to monitor your use of Block systems (including email and Slack communications) and access to Block data to secure our systems, monitor compliance with this Code and other Block policies, and protect our rights and the rights of our customers.

**B.      Duties Under Block's Corporate Governance Guidelines**

34.      Block's Corporate Governance Guidelines require the Board to act in "accordance with its fiduciary duties to the Company and in a manner it reasonably believes to be in the best interests of the Company and its stockholders."

35.      The Corporate Governance Guidelines further mandate that the Board "oversee senior management in the competent and ethical operation of the Company."  To satisfy this duty, the directors are required to take a "proactive, focused approach to their position, and set standards to ensure that the Company is committed to business excellence, ethical and honest conduct, and the highest levels of integrity."

36.      The Company's Lead Independent Director, Defendant Botha, has additional duties under the Corporate Governance Guidelines, including:

- Facilitating discussion and open dialogue among the independent directors during Board meetings, executive sessions and outside of Board meetings;

- Reporting to the Company's Block Head and Chairperson of the Board regarding feedback from executive sessions;

-  Serving as liaison between the Chairperson and the independent directors; and

- In consultation with the Nominating and Corporate Governance Committee, reviewing and reporting on the results of the Board and its Committees' performance self-evaluations.

37.      The Corporate Governance Guidelines impose additional reporting requirements:

When a director, including any director who is currently an officer or employee of the Company, becomes aware of circumstances that may adversely reflect upon the director, any other director, or the Company, the director should notify the Chief Legal Officer of such circumstances, who will direct the matter to the Nominating Committee. The Nominating Committee will consider the circumstances, and may in certain cases request the director to cease the conflicting activity, or in more severe cases, request that the director submit their resignation from the Board if, for example, continuing service on the Board by the individual is not consistent with the criteria deemed necessary for continuing service on the Board.

10

C.    **Additional Duties Of Nominating And Corporate Governance Committee Members**

38.    The Charter of the Nominating and Corporate Governance Committee sets forth additional responsibilities for its members to oversee the development and adequacy of the Corporate Governance Guidelines: "Review annually the Company's corporate governance guidelines approved by the Board and their application, and recommend any changes deemed appropriate to the Board for its consideration."

39.    The Committee must also "[o]versee the Company's corporate governance practices, including reviewing and recommending to the Board for approval any changes to the Company's corporate governance framework."

40.    The Committee is obligated to "[c]onduct a periodic review of environmental, social and governance and other corporate responsibility matters of significance to the Company."

41.    The Committee is further mandated to "[r]eview and monitor" compliance with the Company's Code of Conduct."

D.    **Additional Duties Of Audit And Risk Committee Members**

42.    The Audit and Risk Committee Charter sets forth additional duties for its members obligating them to assist the Board oversight of, among other things, the Company's accounting and financial reporting processes and internal controls; the Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements); and risk assessment and risk management pertaining to the financial and accounting matters of the Company.

43.    The Audit and Risk Committee is also obligated to oversee and monitor significant operating and internal control issues:

- The Committee shall review and discuss with management and the Independent Auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor or management, any special audit steps adopted in light of significant control deficiencies, and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

- The Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures.

- The Committee shall periodically review the activities, organizational structure and qualifications of the internal audit function.

- The Committee shall oversee the review of any complaints and submissions that have been brought to the Committee by the Company's Chief Legal Officer under the Company's Code of Conduct.

- The Committee shall review and discuss with management and the independent auditor, among other things, the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs; any reports received through the Company's reporting hotline; and report regarding compliance with applicable laws, regulations and internal compliance programs.

- The Committee shall discuss with the Company's Chief Legal Officer legal matters that may have a material impact on the financial statements or the Company's compliance procedures.

- The Committee shall oversee procedures established for the receipt, retention and treatment of complaints on accounting, internal accounting controls or audit matters, as well as for confidential and anonymous submissions by the Company's employees concerning questionable accounting or auditing matters.

- The Committee shall review and discuss with management and the independent auditor the Company's major financial and other risk exposures, particularly financial reporting, ***disclosure controls and procedures***, internal control over financial reporting, the Company's programs and policies relating to legal and regulatory compliance, ***data privacy, data security, cybersecurity and operational security and reliability***, and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management.

- The Committee will also review the Company's risk management framework and programs, as well as the framework by which management discusses the Company's risk profile and risk exposures with the Board and its Committees.

12

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Block Collects And Stores Customers' PII

44.    Block operates a payment platform for small and medium sized businesses facilitating their acceptance of credit card payments and the use of tablet computers as payment registers for point-of-sale systems. Block also provides financial and marketing services.

45.    Block offers a payment application called Cash App, initially designed to make Peer-to-Peer payments, *i.e*, for consumers to transfer money to individuals and businesses. Cash App has since been configured for additional uses such as direct deposit payments, the purchase of cryptocurrency, and other investments.

46.    Cash App users must provide the Company with their PII to open an account on the platform, which is collected and stored electronically by Block for security purposes. The Company reassures users that "any information you submit is encrypted and sent to our servers securely," touting the use of "cutting-edge encryption and fraud detection technology" which makes sure "your data and money is secure."[3]

47.    The Company's privacy notice states that the Company takes "reasonable measures, including administrative, technical, and physical safeguards, to protect your information from loss, theft, and misuse, and unauthorized access, disclosure, alteration, and destruction."[4]

### B.    The Individual Defendants Disclose Substantial Cybersecurity Risks

48.    In the Company's public filings with the SEC, Block disclosed the substantial risks that data breaches or the loss of sensitive information pose to the Company. In the Company's

---

[3]    https://cash.app/help/us/en-us/3127-keeping-your-cash-app-secure.

[4]    Privacy Notice, https://cash.app/legal/us/en-us/privacy.

Annual Report on Form 10-K filed with the SEC on February 26, 2020 (the "2019 10-K"),[5] the

risk of a data breach, and the material impact on the Company that would be posed by such a

breach, was expressly addressed:

> If our privacy and security measures or those of third party developers and vendors are inadequate or are breached, and, as a result, there is improper disclosure of or someone obtains unauthorized access to or exfiltrates funds or sensitive information on our systems or our partners' systems, or if we suffer a ransomware or advanced persistent threat attack, or if any of the foregoing is reported or perceived to have occurred, our reputation and business could be damaged. If the sensitive information is lost or improperly accessed, misused, disclosed, destroyed, or altered or threatened to be improperly accessed, misused, disclosed, destroyed, or altered, we could incur significant financial losses and costs and liability associated with remediation and the implementation of additional security measures and be subject to litigation, regulatory scrutiny, and investigations.

49.    The 2020 10-K reveals the Individual Defendants' awareness that the Company

was a specific target for hackers, based on the nature of its business: "[E]lectronic payment

products and services, including ours, have been, and could continue to be in the future, 

specifically targeted and penetrated or disrupted by hackers," posing a material risk to Block and

its core operations:

> Because the techniques used to obtain unauthorized access to data, products, and services and to disable, degrade, or sabotage them change frequently and may be difficult to detect or remediate for long periods of time, we and our customers may be unable to anticipate these techniques or implement adequate preventative measures to stop them. *If we* or our sellers or other customers *are unable to anticipate or prevent these attacks*, our sellers' or other customers' businesses may be harmed, *our reputation could be damaged, and we could incur significant liability*.

---

[5]    The 2019 10-K was signed by all of the Individual Defendants except Defendants Carter and Walker. Defendant Dorsey certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), that the 2019 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act and that the information contained in the 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

50.    Quarterly Reports on Form 10-Q filed with the SEC throughout 2020 contained similar risk disclosures relating to the vulnerability of the Company to hackers and the material risks of a security breach as stated in the 2019 10-K.[6]

51.    In an Annual Report on Form 10-K filed with the SEC on February 23, 2021 (the "2020 10-K"),[7] the Company again detailed the material damage to be incurred by the Company resulting from a security breach:

> If our privacy and security measures or those of third party developers and vendors are inadequate or are breached, and, as a result, there is improper disclosure of or someone obtains unauthorized access to or exfiltrates funds or other sensitive information on our systems or our partners' systems... *our reputation and business could be damaged*. If the sensitive information is lost or improperly accessed, misused, disclosed, destroyed, or altered or threatened to be improperly accessed, misused, disclosed, destroyed, or altered, *we could incur significant financial losses and costs and liability associated with remediation and the implementation of additional security measures and be subject to litigation, regulatory scrutiny, and investigations*.

52.    The 2020 10-K reiterated that the Company was a prime target for hackers and other malicious actors:

> Additionally, electronic payment, hardware, and software products and services, including ours, have been, and could continue to be in the future, specifically targeted and penetrated or disrupted by hackers and other malicious actors…If we or our sellers or other customers are unable to anticipate or prevent these attacks, our sellers' or other customers may be harmed, *our reputation could be damaged, and we could incur significant liability*.

---

[6]    *See* Block's Quarterly Reports on Form 10-Q filed with the SEC on May 6, 2020, August 5, 2020, and November 5, 2020.

[7]    The 2020 10-K was signed by all of the Individual Defendants except Defendant Carter. Defendant Dorsey certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), that the 2020 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act and that the information contained in the 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

53.     On November 4, 2021, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q"), which was signed by Defendant Dorsey.[8] The 3Q21 10-Q disclosed the risks connected with "real or perceived security breaches or incidents or human error in administering our software, hardware, and systems," as well as that "*[o]ur products and services may not function as intended due to errors in our software, hardware, and systems, product defects, or due to security breaches or incidents or human error in administering these systems, which could materially and adversely affect our business."* (Emphasis in original).

54.     The 3Q21 10-Q noted further that any "errors, data leaks, security breaches or incidents, disruptions in services, or other performance problems with our products or services caused by external or internal actors could hurt our reputation and damage our customers' businesses."

55.     A further material risk to the Company that was disclosed was that of security breaches:

> [S]ecurity breaches or incidents such as cyber-attacks or identity theft could disrupt the proper functioning of our software products or services, cause errors, allow loss or unavailability of, unauthorized access to, or disclosure of, proprietary, confidential or otherwise sensitive information of ours or our customers, and other destructive outcomes…. Any of the foregoing issues could lead to product recalls and inventory shortages, result in costly and time-consuming efforts to redesign and redistribute our products, give rise to regulatory inquiries and investigations, and result in lawsuits and other liabilities and losses, which could have a material and adverse effect on our business.

---

[8]     Dorsey certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that the 3Q21 10-Q fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act and that the information contained in the 3Q21 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company.

56.    The 3Q21 10-Q also stated that "[a]s [the Company's] hardware and software services continue to increase in size and complexity, and as we integrate new, acquired subsidiaries with different technology stacks and practices, these risks may correspondingly increase as well."

57.    On February 24, 2022, the Company filed with the SEC its Annual Report on Form 10-K (the "2021 10-K"), which was signed by all the Individual Defendants.[9] The 2021 10-K made similar risk disclosures as those outlined in the 3Q21 10-Q.

### C.    Applicable Federal And State Data Security And Privacy Laws

58.    The Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, prohibits "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC"), which enforces the FTCA, renders a company's failure to maintain reasonable and appropriate data security over customers' PII an "unfair practice."[10]

59.    The FTC mandates that companies implement strong data security practices to protect PII. As far back as 2016, the FTC updated its guide for "protecting personal information"[11] to establish five key principles of a sound data security plan, including: 1) knowing what personal information a company has on its servers; 2) scaling down the retention of information to what is truly needed; 3) protecting the information the company has retained; 4) properly disposing of the information that is not needed; and 5) creating a detailed plan to respond to security incidents.

---

[9]    Dorsey certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), that the 2021 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act and that the information contained in the 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

[10]    *See, e.g., FTC v. Wyndham Worldwide Corp.,* 799 F.3d 236 (3d Cir. 2015); *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953 (N.D. Cal. 2016).

[11]    Federal Trade Comm'n, *Protecting Personal Information: A Guide For Business*, (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf.

60.    The FTC has brought enforcement actions against companies for failing to protect customers' PII reasonably and adequately and considered the failures to do so a violation of the prohibition on unfair and deceptive practices under Section 5 of the FTCA.

61.    California law requires a business to notify any California resident whose unencrypted personal information was acquired, or reasonably believed to have been acquired, by an unauthorized person. California Civ. Code § 1798.82(a).

62.    When a company is required to issue a security breach notification to more than five hundred California residents as a result of a single data security breach, that company must electronically submit a sample copy of that security breach notification to the California Attorney General. California Civ. Code § 1798.82(f).

63.    The California Consumer Privacy Act of 2018 (the "CCPA") gives consumers additional rights regarding data security, including the right to know what personal information is retained by a company and how it is being used. Consumers must also be able to obtain and delete their own PII at any time.

64.    Delaware updated its data privacy laws in 2017. The new law requires persons conducting business in the state to "implement and maintain reasonable procedures and practices to prevent the unauthorized acquisition, use, modification, disclosure, or destruction of personal information collected or maintained in the regular course of business."[12] The Delaware Attorney General must be notified if more than five hundred Delaware residents were affected in the breach.

---

[12]    6 Del. C. § 12B-100.

65.     The Identity Theft Enforcement and Protection Act, which Texas enacted in 2007, requires businesses to implement "reasonable procedures" to prevent the unlawful use of customers' personal data.  Sec. 521.052.[13]

66.     In June 2019, Texas enacted House Bill 4390, the Texas Privacy Protection Act. Many of the law's provisions went into effect in 2020.  The Privacy Protection Act requires businesses to notify affected customers of a data breach involving sensitive personal information within sixty days of the incident.  Further, the Texas Attorney General must be notified if the data breach affected two hundred and fifty or more Texas residents.

**D.     Block Failed To Comply With Well-Established Industry Cybersecurity Practices**

67.     In 2019, IBM published a "Cost of Data Breach" report which was the culmination of an analysis of data breaches from 500 organizations. The report found that in 2019 the average cost per breach within the financial services industry was $5.86 million.

68.     Another IBM study found that human error was a major contributing cause in 95% of all data breaches.[14]   The IBM X-Force Threat Intelligence Index[15] for 2021 stated that the finance and insurance industry continues to be the most targeted businesses for five years running, making up 23% of all attacks.[16] IBM provided a list of best practices for companies to follow,

---

[13]     https://statutes.capitol.texas.gov/Docs/BC/htm/BC.521.htm.

[14]     Micke Ahola, *The Role of Human Error in Successful Cyber Security Breaches,* https://blog.usecure.io/the-role-of-human-error-in-successful-cyber-security-breaches (last visited Jan. 11, 2023).

[15]     https://www.ibm.com/reports/threat-intelligence/;https://inspiredelearning.com/blog/insights-from-the-ibm-x-force-threat-intelligence-index-2021/.

[16]     *Id.*

including: protecting against insider threats; building and training an "incident response team within an organization"; and stress testing an "organization's incident response plan to develop muscle memory."[17] The Microsoft Threat Protection Intelligence Team recommends that companies, among other things, apply the latest security updates, use threat and vulnerability management, and monitor for adversarial activities in order to protect PII.[18]

69.    Even more specifically, companies suffer from ex-employees retaining access to sensitive data after their employment. According to a study by Osterman Research, 69% of the organizations surveyed have suffered a loss of data as a result of employee departure. The Osterman Research White Paper[19] provides best practices for companies to prevent employees from accessing sensitive data after leaving their positions, including maintaining "complete, ongoing visibility of sensitive corporate data across all of their endpoints, cloud applications and any other repositories where this data might be stored."

### E.    The Individual Defendants Ignored Red Flag Security Flaws

70.    Cash App user accounts were hacked on a number of occasions, resulting in fraudulent transfers of customer funds. In March 2021, it was reported that hackers accessed and took all of the cash, stock, and bitcoin in certain Cash App customer accounts.[20] Cash App

---

[17]    https://www.microsoft.com/en-us/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster.

[18]    https://www.sealpath.com/blog/ex-employee-taking-sensitive-data/, February 10, 2020.

[19]    https://www.archive360.com/ediscovery-office-365-compliance-whitepaper-typ-0?submissionGuid=4dfc5a4b-b60a-49d0-9f7a-b761a4b73341.

[20]    Alexis Keenan, *Square's Cash App Vulnerable to Hackers*, *Yahoo*, https://www.yahoo.com/video/squares-cash-app-vulnerable-to-hackers-customers-claim-113556593.html.

customers who had their accounts hacked attempted to contact Cash App about the incidents, but nothing was done. Many affected users found it nearly impossible to reach a live representative to discuss the security breaches. Scam artists played on affected users' frustrations by creating imposter company contact numbers to steal customers' account information.[21]

71.    From February 2020 through March 2021, the Better Business Bureau (BBB) received and reviewed 2,485 complaints concerning Cash App, and 3,532 concerning Square, where customers also logged Cash App complaints.[22] In that same timeframe, complaints for Venmo, a Cash App competitor, totaled a mere 928 and only 83 complaints were handled for Zelle.[23] Further, in 2020, Cash App user reviews mentioning the words "fraud" or "scam" increased by 335%.

72.    An August 2021 *Medium* article discussed the proliferation of hacking attacks on Cash App and Block's lack of response.  The Company's lack of internal controls was identified as the cause for the numerous security breaches: "A company, like Cash App, is however at fault for not having better blocks and ways to flag anything suspicious as well as having a dedicated way for customers to report fraud if it does happen." [24]

---

[21]    *Id.*

[22]    *Id.*

[23]    *Id.*

[24]    Audrey Malone, *You Can Get Hacked on Cash App Easier than you Might Think*, August 30, 2021, https://medium.datadriveninvestor.com/you-can-get-hacked-on-cash-app-afbbf5420acf.

**F.      The Company's Inadequate Security Practices Result In A Significant Data Breach That Block Failed To Disclose For Four Months**

73.      In the Company's 2021 10-K, the Individual Defendants made no disclosure of the December 2021 data breach. On the same day, the Company filed with the SEC a Current Report on Form 8-K, attaching a letter to shareholders announcing the Company's fourth quarter financial results. Neither the 8-K nor the shareholder letter addressed the security breach which potentially affected over eight million customers.

74.      On April 4, 2022, in a Current Report on Form 8-K filed with the SEC, Block disclosed a data breach ***occurring over four months earlier*** in December 2021. The Company determined that "a former employee downloaded certain reports of its subsidiary Cash App Investing LLC on December 10, 2021, that contained some U.S. customer information." The Company noted that "these reports were accessed [by the former employee] without permission after their employment ended."

75.      In the 8-K, the Company reported that the information accessed by the employee included customer PII: "The information in the reports included full name and brokerage account number (this is the unique identification number associated with a customer's stock activity on Cash App Investing), and for some customers also included brokerage portfolio value, brokerage portfolio holdings and/or stock trading activity for one trading day."

76.      The Company reported that it had launched an investigation with its outside counsel and with the help of a forensics firm. The Company reached out to "approximately 8.2 million current and former customers" with information about the breach and notified "the applicable regulatory authorities" and law enforcement.

77.    The price of the Company's stock fell $9.27 per share, or 6.4%, from $145.19 per share at the close of trading on April 4, 2022, to $135.92 per share at the close of trading on April 5, 2022.

78.    Months later, hackers were still using the purloined PII. Multiple customers' accounts were illegally accessed and emptied.[25]   CashApp login details were still being sold on the dark web and social media marketplaces. One listing for hacked CashApp accounts even stated that the vendor sold the specific item "multiple times."

### G.    The Individual Defendants Cause The Company To Repurchase Stock At Inflated Prices

79.    The Individual Defendants further damaged Block by causing the Company to repurchase common stock at artificially inflated prices. The Company spent over $196.3 million to repurchase approximately 1,207,221 shares of its own common stock at artificially inflated prices from November 2021 through March 2022, as set forth below and detailed in the 2021 10-K and the Quarterly Report on Form 10-Q the Company filed with the SEC on May 5, 2022 for the period ended March 31, 2022 (the "1Q22 10-Q"):

| DATE | AVG. PRICE PER SHARE | SHARES BOUGHT | TOTAL PRICE PAID |
|---|---|---|---|
| Nov. 2021 | $255.04 | 14,493 | $3,696,295 |
| Dec. 2021 | $243.99 | 192 | $46,846 |
| Jan. 2022 | $161.51 | 3,814 | $615,999 |
| Feb. 2022 | $161.51 | 375,968 | $60,722,592 |
| Mar. 2022 | $161.51 | 812,754 | $131,267,899 |
| TOTAL: | | 1,207,221 | $196,349631 |

---

[25]    Joseph Cox, *Hackers Are Breaking Into and Emptying Cash App Accounts,* August 24, 2022, https://www.vice.com/en/article/dy7yyy/my-cash-app-hacked-hackers-stealing-money.

80.     The material decline in the Company's stock price close on the heels of the revelation of the data breach and Block's failure to adequately respond demonstrates that the stock repurchases authorized by the Individual Defendants were made at artificially inflated prices to the detriment of Block and its shareholders.

**H.    Block's False And Misleading Proxy Statement**

81.     On April 28, 2022, the Company filed its 2022 Proxy Statement with the SEC soliciting shareholder votes to, among other things, re-elect Defendants Dorsey and Deighton to the Board and approve executive compensation. The Proxy Statement was issued by the order of the Board and signed by Defendant Dorsey.

82.     The 2022 Proxy Statement represented that the Board oversees and monitors the Company's risk exposures:

> Our board of directors recognizes the oversight of risk management as one of its primary responsibilities and central to maintaining an effective, risk aware and accountable organization. The oversight responsibility of our board of directors and its committees is enabled by management reporting processes that are designed to provide visibility to our board of directors regarding the identification, assessment and management of risks and management's strategic approach to risk mitigation. Our Lead Independent Director and Chair of our audit and risk committee meets with our Internal Audit Lead, Chief Financial Officer, Chief Compliance Officer and Chief Legal Officer on a regular cadence to identify and discuss risks and exposures and escalates potential issues to our audit and risk committee or board of directors, as appropriate.

83.     The 2022 Proxy Statement represented that the Company's Enterprise Risk Assessment is shared and discussed with the Board:

> As part of our overall risk management process, we conduct an Enterprise Risk Assessment ("ERA") on an annual basis, which is shared and discussed with our board of directors. The oversight of the ERA is supported and enabled by our audit and risk committee. In addition, our board of directors' responsibilities related to oversight of the ERA framework include a routine evaluation of the processes, as well as discussions with key management and representatives of outside advisors as appropriate, used to identify, assess, monitor and report on risks across the organization and the setting and communication of the organization's

implementation and measurement of risk tolerances, limits and mitigation. These primary risk focus areas are defined by the board of directors, management and leaders of our ERA review as strategic, operational, people, financial and compliance and consist of risks such as *cybersecurity*, financial reporting and competition.

84.    The 2022 Proxy Statement represented that the Company is committed to strong corporate governance practices: "We are committed to having sound corporate governance principles that we believe promote long-term value and serve the best interest of all our stockholders, sellers, customers and other stakeholders."

85.    The 2022 Proxy Statement represented that the Company has robust corporate governance in place:

In 2021, we continued corporate governance practices that we believe promote long-term value, engender public trust and serve the best interest of our stockholders, sellers, customers and other stakeholders. Some highlights of our corporate governance practices are our lead independent director role with a comprehensive scope of responsibilities, annual review of our corporate governance policies and charters, robust process for developing a pipeline for potential director candidates, strong risk oversight controls by the full board and committees and significant stock ownership requirements for directors and executive officers.

86.    The foregoing statements in the 2022 Proxy Statement were false and misleading and omitted material information. Contrary to the representations made in the Proxy, the Board was required, but failed, to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Block's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls over cybersecurity and disclosure practices.

87.    On June 17, 2022, Block filed with the SEC a Current Report on Form 8-K announcing, among other things, the reelection of Defendants Dorsey and Deighton, and the approval of executive compensation, pursuant to the solicitations in the 2022 Proxy Statement.

**I.    A Securities Class Action And Consumer Class Action Lawsuit Are Filed Against The Company**

88.    On October 11, 2022, a securities class action lawsuit was filed in this Court against the Company, Defendant Dorsey and Amrita Ahuja, Block's Chief Financial Officer, captioned *Esposito v. Block, Inc., et al*., No. 1:22-cv-08636-RA (S.D.N.Y.), alleging violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC. The complaint seeks damages on behalf of a class of stockholders who purchased Block shares between November 4, 2021, and April 4, 2022, inclusive. The plaintiff asserts that the price of Block common stock was artificially inflated by the defendants' false and misleading statements about the Company's data security practices.

89.    On November 2, 2022, a consumer class action was filed in the United States District Court for the Northern District of California against the Company and Cash App, captioned *Gordon v. Block, Inc., et al*., No. 3:22-cv-06787-JSC (N.D. Cal.), alleging negligence, violations of California and Texas consumer protection laws, fraud by omission, violation of Cal. Civ. Code §1710 (deceit by concealment), breach of implied contract, breach of confidence, invasion of privacy, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, and seeking equitable relief.  The complaint seeks damages on behalf of a nationwide class whose PII were compromised as a result of the data breach as customers of defendants or any of Defendant's affiliates, parents or subsidiaries and a Texas subclass defined as any person residing in Texas whose PII was compromised as a result of the breach as customers of defendants or any of Defendant's affiliates, parents or subsidiaries. The plaintiff asserts that the defendants failed to

disclose to investors that the Company lacked adequate protocols restricting access to customer sensitive information and failed to implement reasonable security measures to properly safeguard customer PII.

## VI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

90.     Plaintiff brings this action derivatively and for the benefit of Block to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Block, gross mismanagement, and violations of Sections 10(b), as well as Rule 10b-5 promulgated thereunder by the SEC, and 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

91.     Block is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

92.     Plaintiff is, and has been at all relevant times, a stockholder of Block and was a stockholder of the Company at the time of the transactions alleged herein.  Plaintiff will adequately and fairly represent the interests of Block in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

93.     Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused. The Board is neither disinterested nor independent.

### A.    Demand Upon Defendant Dorsey Is Excused

94.     Defendant Dorsey is the co-founder of Block serving as a principal executive officer and as a director since July 2009.  Dorsey served as Block's CEO and President from July 2009 until April 2022, when he became Block Head and Chairperson of the Board.  Defendant Dorsey is also a controlling shareholder.  Dorsey therefore is not independent. Indeed, Block' s 2022 Proxy Statement does not list Dorsey as an independent director.

95.     Dorsey will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.   As of March 31, 2022, Dorsey beneficially owns 48,844,566 Class B Block common shares, giving him 43.04% of the Company's voting control. If Dorsey acknowledged that he, Block, or others engaged in misconduct, his investment in Block would be substantially devalued and his lucrative position jeopardized. Acknowledging that executives at Block engaged in the wrongdoing alleged would be an admission that he, as a principal executive officer of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

96.     Defendant Dorsey is also in a position of control at Block, with 43.04% of total voting power as of March 31, 2022.  Consequently, the Individual Defendants cannot consider a demand to take action against Dorsey with the required independence.

97.     Defendant Dorsey is named as a defendant in the pending securities class action lawsuit.  As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

98.     Dorsey signed the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

99.     Dorsey benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Block Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

100.    Dorsey has a long-standing business and personal relationship with Defendant McKelvey which precludes them from acting in an independent and disinterested manner.  Dorsey

was first introduced to programming when he was hired at a company headed by McKelvey.[26] McKelvey dubbed Dorsey "Jack the Genius" and commented that "they got along great." The two have been friends and partners ever since that first meeting. In an interview in 2020, McKelvey referred to Dorsey as the "perfect partner."

101. Dorsey, as a director of Block, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Block's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls over cybersecurity practices.

102. Dorsey is neither disinterested nor independent. Any demand upon Defendant Dorsey is futile and, thus, excused.

**B.    Demand Upon Defendant Botha Is Excused**

103. Botha will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of March 31, 2022, Botha beneficially owns 711,719 Class A Block shares. If Botha acknowledged that he, Block, or others engaged in misconduct, his investment in Block would be substantially devalued and his lucrative position jeopardized. Acknowledging that executives at Block engaged in the wrongdoing alleged would be an admission that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

---

[26]    *See* Emine Saner, *My First Boss: Co-Founder of Twitter Jack Dorsey and Tech Entrepreneur Jim McKelvey, The Guardian,* April 5, 2014, https://www.theguardian.com/ lifeandstyle/2014/apr/05/jack-dorsey-first-boss-jim-mckelvey-twitter.

104.    Botha is a partner at Sequoia Capital, a venture capital firm. Sequoia Capital partnered with Defendant Dorsey and Block on cryptocurrency investments.[27] Accordingly, Botha cannot consider a demand against the other Board members because it would damage Botha and Sequoia Capital's credibility and weaken their ability to attract future business.

105.    Botha authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

106.    Botha, as a director of Block, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Block's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls over cybersecurity practices.

107.    Botha, as a member of the Audit and Risk Committee, had duties regarding oversight of the risks facing the Company and Block's compliance with relevant laws, rules, and regulations.  Botha utterly failed to perform these essential duties.

108.    Botha, as Lead Independent Director, had additional duties of oversight and enhancing communication, including reviewing and reporting on the results of the Board and its committees' performance self-evaluations. Botha utterly failed to perform these essential duties.

109.    Botha is neither disinterested nor independent. Any demand upon Defendant Botha is futile and, thus, excused.

---

[27]    *See* Nicolas Parasie, *Jack Dorsey's Block, Sequoia Back Egyptian Fintech Firm Telda,* Bloomberg, Oct. 12, 2022, https://www.bloomberg.com/news/articles/2022-10-12/jack-dorsey-s-block-sequoia-back-egyptian-fintech-firm-telda; Michelle Bailhe, et al., February 17, 2022, https://sequoia.medium.com/a-block-step-forward-14274f4a0e65.

### C.    Demand Upon Defendant Brooks Is Excused

110.    Brooks will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  As of March 31, 2022, Brooks beneficially owns 711,719 Class A Block shares.  If Brooks acknowledged that she, Block, or others engaged in misconduct, her investment in Block would be substantially devalued and her lucrative position jeopardized. Acknowledging that executives at Block engaged in the wrongdoing alleged would be an admission that she, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

111.    Brooks authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

112.    Brooks, as a director of Block, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Block's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls over cybersecurity practices.

113.    Brooks failed to uphold her additional obligations as a member of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

114.    Brooks is neither disinterested nor independent.  Any demand upon Defendant Brooks is futile and, thus, excused.

### D.    Demand Upon Defendant Carter Is Excused

115.    Since March 2015, Carter has been a founder, shareholder and artist of TIDAL, a global music and entertainment platform, which is currently majority owned by Block.  Carter has an ownership interest in Roc Nation and is its co-founder. Roc Nation holds an approximate 50% ownership interest in an affiliate, ESM Productions LLC ("ESM").

116.    The 2022 Proxy Statement provides further details about the TIDAL acquisition and Carter's profits from the TIDAL acquisition:

> We acquired a majority ownership stake in TIDAL in April 2021 and as part of the acquisition's consideration Mr. Shawn Carter directly and indirectly through entities affiliated with him, *received approximately $63.4 million in the aggregate*, and a family member received approximately $450,000, in each case, in the form of cash and common stock (the "Acquisition Consideration"). Mr. *Carter was also reimbursed $4.5 million in connection with certain insurance expenses related to the transaction.*

> Shawn Carter, who was appointed as a member of our board of directors upon the acquisition's closing, retains a minority interest in TIDAL's parent company.

117.    The 2022 Proxy Statement describes a sublease agreement with Roc Nation:

> In connection with our acquisition of a majority ownership stake in TIDAL, we entered into a sublease agreement with Roc Nation, an entertainment company, in April 2021 for approximately 15,875 square feet of office space in New York City at an annual base rate of approximately $1.5 million (the "Roc Nation Sublease"). The Roc Nation Sublease has a term of one-year, during which time it was expected that members of the TIDAL team would occupy the space. The Roc Nation Sublease was terminated in October 2021. During the fiscal year ended December 31, 2021, we made approximately $700,000 in payments in connection with the Roc Nation Sublease.

118.    The 2022 Proxy details partnerships between Block, Roc Nation artists, and Roc Nation affiliates:

> Additionally, we entered into one-year partnerships with two musical artists represented by Roc Nation for certain Cash App marketing campaigns (the "Roc Nation Marketing Services"). During the fiscal year ended December 31, 2021, we made approximately $165,000 in payments in connection with the Roc Nation Marketing Services under this partnership. We also engaged Roc Nation and its

affiliate ESM…for broadcast and artist services for TIDAL's stage at certain music concerts ("Roc Nation Concert Services"). During the fiscal year ended December 31, 2021, we made approximately $260,000 in payments to ESM and approximately $192,000 to Roc Nation in connection with Roc Nation Concert Services.

Further, TIDAL engaged ESM in June 2021 for certain production services for a documentary entitled "Triumph Over Trauma: Black Wall Street Then and Now" (the "ESM Production Services"). During the fiscal year ended December 31, 2021, we made approximately $350,000 in payments in connection with the ESM Production Services under this engagement.

119.    Defendant Carter is not independent. Indeed, Block's 2022 Proxy Statement does not list Carter as an independent director.

120.    Carter will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of March 31, 2022, Carter beneficially owns 31,607 Class A Block shares. If Carter acknowledged that he, Block, or others engaged in misconduct, his investment in Block would be substantially devalued and his lucrative position jeopardized. Acknowledging that executives at Block engaged in the wrongdoing alleged would be an admission that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

121.    Carter authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

122.    Carter, as a director of Block, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Block's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls over cybersecurity practices.

123.    Carter is neither disinterested nor independent. Any demand upon Defendant Carter is futile and, thus, excused.

**E.    Demand Upon Defendant Deighton Is Excused**

124.    Deighton will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  As of March 31, 2022, Deighton beneficially owns 30,185 Class A Block shares.  If Deighton acknowledged that he, Block, or others engaged in misconduct, his investment in Block would be substantially devalued and his lucrative position jeopardized.  Acknowledging that executives at Block engaged in the wrongdoing alleged would be an admission that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

125.    Deighton authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

126.    Deighton benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Block Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

127.    Deighton, as a director of Block, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Block's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls over cybersecurity practices.

128.     Deighton, as Chair of the Audit and Risk Committee, had duties regarding oversight of the risks facing the Company and Block's compliance with relevant laws, rules, and regulations. Deighton utterly failed to perform these essential duties.

129.     Deighton is neither disinterested nor independent. Any demand upon Defendant Deighton is futile and, thus, excused.

**F.    Demand Upon Defendant Garutti Is Excused**

130.     Garutti will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of March 31, 2022, Garutti beneficially owns 18,605 Class A Block shares. If Garutti acknowledged that he, Block, or others engaged in misconduct, his investment in Block would be substantially devalued and his lucrative position jeopardized. Acknowledging that executives at Block engaged in the wrongdoing alleged would be an admission that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

131.     Garutti authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

132.     Garutti is the CEO of Shake Shack. According to the 2022 Proxy Statement, a Shake Shack affiliate is engaged in a lucrative "amended and restated enterprise services agreement and a Cash App boost agreement" with Block, pursuant to which Block provides "certain products and services related to payment processing, software as a service, hardware and instant rewards:"

> In January 2021, we extended our Cash Boosts partnership with Shake Shack. During the fiscal year ended December 31, 2021, we received approximately $2.9 million in revenue from [these services and] partnership and made approximately $25,000 in payments to Shake Shack in connection with the Cash Boosts partnership.

As a result of these connections with Block, Garutti, as CEO of Shake Shack, cannot consider a demand with the required disinterest and independence.

133.    Garutti, as a director of Block, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Block's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls over cybersecurity practices.

134.    Garutti failed to uphold his additional obligations as Chair of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

135.    Garutti is neither disinterested nor independent. Any demand upon Defendant Garutti is futile and, thus, excused.

### G.    Demand Upon Defendant McKelvey Is Excused

136.    As co-founder of Block, Defendant McKelvey is not independent. Indeed, Block's 2022 Proxy Statement does not list McKelvey as an independent director.

137.    McKelvey will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  As of March 31, 2022, McKelvey beneficially owns 125,061 Class A Block shares and 12,259,025 Class B Block shares, giving him more than 10.8% of the Company's voting control.  If McKelvey acknowledged that he, Block, or others engaged in misconduct, his investment in Block would be substantially devalued and his lucrative position jeopardized.  Acknowledging that executives at Block engaged in the wrongdoing alleged

would be an admission that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

138.    McKelvey authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

139.    McKelvey has a long-standing business and personal relationship with Defendant Dorsey which precludes them from acting in an independent and disinterested manner.  Dorsey was first introduced to programming when he was hired at a company headed by McKelvey. McKelvey dubbed Dorsey "Jack the Genius" and commented that "they got along great."  The two have been friends and partners ever since that first meeting.   In an interview in 2020, McKelvey referred to Dorsey as the "perfect partner."

140.    In addition, McKelvey benefited from a lease agreement with Block for 900 N. Tucker, a St. Louis property affiliated with McKelvey, which would preclude him from considering a demand to act against the other Individual Defendants in an independent manner. The 2022 Proxy details this agreement:

> In July 2019, we entered into a lease agreement with 900 N. Tucker Building, LLC ("900 N. Tucker") for a 15.5-year lease of office space in St. Louis, Missouri (the "St. Louis Lease"). Block began occupying the office space in July 2021. During the fiscal year ended December 31, 2021, we made approximately $1.3 million in payments in connection with the St. Louis Lease. During the fiscal year ending December 31, 2022, we expect to make monthly lease payments in accordance with the previously disclosed terms of the St. Louis Lease, as well as associated costs such as parking fees, management fees and annual direct expenses (e.g., operating and tax expenses). We expect that these lease payments will be offset, in part, by tenant improvement allowances under the terms of the St. Louis Lease.

141.    McKelvey, as a director of Block, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Block's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks

facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls over cybersecurity practices.

142.    McKelvey is neither disinterested nor independent.  Any demand upon Defendant McKelvey is futile and, thus, excused.

**H.    Demand Upon Defendant Meeker Is Excused**

143.    Meeker will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  As of March 31, 2022, Meeker beneficially owns 406,250 Class A Block shares.  If Meeker acknowledged that she, Block, or others engaged in misconduct, her investment in Block would be substantially devalued and her lucrative position jeopardized.  Acknowledging that executives at Block engaged in the wrongdoing alleged would be an admission that she, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.  Meeker authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

144.    Defendant Meeker and Summers prior business relationship precludes them from considering a demand with the requisite disinterest and independence.  The two served on the board of LendingClub Corp. for about six years together.

145.    Meeker, as a director of Block, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Block's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls over cybersecurity practices.

146. Meeker is neither disinterested nor independent. Any demand upon Defendant Meeker is futile and, thus, excused.

**I.      Demand Upon Defendant Summers Is Excused**

147. Summers will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. As of March 31, 2022, Summers beneficially owns 20,559 Class A Block shares and 67,380 Block Class B shares. If Summers acknowledged that he, Block, or others engaged in misconduct, his investment in Block would be substantially devalued and his lucrative position jeopardized. Acknowledging that executives at Block engaged in the wrongdoing alleged would be an admission that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing. Summers authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

148. Defendant Meeker and Summers prior business relationship precludes them from considering a demand with the requisite disinterest and independence. The two served on the board of LendingClub Corp. for about six years together.

149. Summers, as a director of Block, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Block's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls over cybersecurity practices.

150.    Summers, as a member of the Audit and Risk Committee, had duties regarding oversight of the risks facing the Company and Block's compliance with relevant laws, rules, and regulations.  Summers utterly failed to perform these essential duties.

151.    Summers is neither disinterested nor independent.  Any demand upon Defendant Summers is futile and, thus, excused.

**J.    Demand Upon Defendant Walker Is Excused**

152.    Walker will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  As of March 31, 2022, Walker beneficially owns 2,968 Class A Block shares.  If Walker acknowledged that he, Block, or others engaged in misconduct, his investment in Block would be substantially devalued and his lucrative position jeopardized. Acknowledging that executives at Block engaged in the wrongdoing alleged would be an admission that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

153.    Walker is connected to Defendant Dorsey through his work as the President of the Ford Foundation. Specifically, Dorsey, the Ford Foundation and others are backing a fund, of which Defendant Walker is Co-Chair. [28]  Consequently, Walker cannot consider a demand against Defendant Dorsey a with the required disinterest and independence.

154.    Walker authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

155.    Walker, as a director of Block, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with

---

[28]    Issie Lapowsky, *Big Tech Billionaire-Backed Philanthropy Announces Fund to 'Reset' the Job Market, Protocol,* Oct. 5, 2021, https://www.protocol.com/policy/families-workers-fund.

all laws, rules, and regulations governing Block's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls over cybersecurity practices.

156.    Walker failed to uphold his additional obligations as a member of the Nominating and Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

157.    Walker is neither disinterested nor independent.  Any demand upon Defendant Walker is futile and, thus, excused.

### K.    Other Factors Demonstrating That Demand Upon The Individual Defendants Is Excused

158.    Block has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover the damages it has suffered and will continue to suffer thereby.

159.    The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

160.    Publicly traded companies, such as Block, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses.  However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Block's damages.

## VII.    CLAIMS FOR RELIEF

### COUNT ONE
**Against the Individual Defendants for Violations of**
**Section 10(b) of the Exchange Act**

161.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

162.    The Individual Defendants made, disseminated, or approved false and misleading statements about the Company and that omitted material information specified herein, which they knew or deliberately disregarded were false and misleading or incomplete and were intended to deceive, manipulate, or defraud. Those false and misleading or incomplete statements and the Individual Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

163.    The Individual Defendants caused the Company to repurchase over a million shares of its own stock at prices that were artificially inflated due to the false and misleading and incomplete statements.  The Individual Defendants engaged in a scheme to defraud the Company by causing it to repurchase its shares at inflated prices.

164.    The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with the Company's purchases of Block common stock at all relevant times.

165.    The Individual Defendants directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made or disseminated various false and misleading statements of material facts and omitted to state material facts necessary in order to make the statements made or disseminated, in light of the circumstances under which they were made or disseminated, not misleading; made or disseminated the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the Company's purchase of Block common stock, which were intended to, and did deceive regarding its performance and the effectiveness of its internal controls.

166.    The Individual Defendants were directors or officers of the Company, and were therefore directly responsible for, and are liable for, all materially false and misleading or incomplete statements made at all relevant times, as alleged above.

167.    As described above, the Individual Defendants acted with scienter at all relevant times, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.   The misstatements and omissions of material fact were either known to the Individual Defendants or they should have been aware of them through their access to information that contradicted their statements.

168.    As a result of the Individual Defendant's misconduct, Block has suffered damage in that it paid artificially inflated prices for its common stock and suffered losses when the true facts became known. The Individual Defendants are liable to the Company pursuant to Section 10 (b) of the Exchange Act and SEC Rule 10b-5.

## COUNT TWO
**Against the Individual Defendants for
Violations of Section 14(a) of the Exchange Act**

169.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

170.    The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

171.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

172.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

173.    The 2022 Proxy Statement was materially false and misleading because the Individual Defendants were required, but failed to: (1) implement and maintain an effective system

of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Block's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls over cybersecurity and disclosure practices.

174.    The misleading information contained in the 2022 Proxy Statement was material to Block shareholders in determining whether to elect Defendants Dorsey and Deighton to the Board and approve the executive compensation.

175.    The material misstatements and omissions in the 2022 Proxy Statement damaged the Company.

176.    Plaintiff, on behalf of Block, seeks relief for damages inflicted upon the Company based on the misleading 2022 Proxy Statement in connection with the improper election of Defendants Dorsey and Deighton and the approval of the executive compensation.

## COUNT THREE
### Against the Individual Defendants
### for Breach of Fiduciary Duties

177.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

178.    The Individual Defendants owed and owe fiduciary duties to Block.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Block the highest obligation of good faith and loyalty in the administration of Block's affairs, including assuring that Block complied with state and federal laws governing, among other things, the protection of consumer PII, as well as the making of truthful, complete, and accurate public statements regarding the Company's financial condition and business prospects.  The Board also

had specific duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Block alleged herein.

179.    The Individual Defendants ignored their duties.  The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

180.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned, and abdicated their responsibilities and duties regarding prudently managing the business of Block in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Block's affairs and in the use and preservation of Block's assets.

181.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Block has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damages include, among other things, the costs of defending and resolving the pending Securities Class Action and Consumer Class Action.

182.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT FOUR**
**Against the Individual Defendants**
**for Contribution and Indemnification**

183.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

184.    The Company's alleged liability on account of the wrongful acts and practices, as well as related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants.

185.    The Company has suffered significant and substantial injury as a direct result of the Individual Defendants' actions. Plaintiff, on behalf of the Company, seeks relief from the Individual Defendants on a theory of contribution and indemnity to the extent that the Company is found liable for the Individual Defendants' actions.

## COUNT FIVE
### Against the Individual Defendants
### for Aiding and Abetting

186.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

187.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

188.    In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

189.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

190.    Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

## VIII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Block and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants violated Sections 10(b) and 14(a) of the Exchange Act;

(c)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Block;

(d)    Directing the Company to take all necessary actions to implement and maintain an effective system of internal controls and meaningful Board oversight;

(e)    Determining and awarding to Block the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(f)    Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(g)    Awarding Block restitution from the Individual Defendants, and each of them;

(h)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(i)    Granting such other and further relief as the Court may deem just and proper.

## IX.  JURY DEMAND

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: January 17, 2023

**WEISS LAW**

**OF COUNSEL**

By:  _/s/ David C. Katz_
    David C. Katz
Michael C. McKay                Mark Smilow
**MCKAY LAW, LLC**              305 Broadway, 7th Floor
5635 N. Scottsdale Road, Suite 170    New York, NY 10007
Scottsdale, AZ 85250            Telephone: (212) 682-3025
Telephone: (480) 681-7000       Facsimile: (212) 682-3010
Email: mmckay@mckaylaw.us       Email: dkatz@weisslawllp.com
                                    msmilow@weisslawllp.com

_Counsel for Plaintiff_

## VERIFICATION

I, Neil Zeitouni, hereby verify that I have held stock in Block, Inc. ("Block" or the "Company") at all relevant times. As such, I was a stockholder at the time of the transactions complained of in the Verified Stockholder Derivative Complaint ("Complaint").  I am ready, willing, and able to pursue this stockholder derivative action on behalf of Block. I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true.  Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing.

Dated: January 13, 2023

*Neil Zeitouni*
Neil Zeitouni